**Joan H. KELLY**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, and IBM Total and Permanent Disability Income Plan.**

**Civ. A. No. 82–3705.**

United States District Court, E.D. Pennsylvania.

Oct. 13, 1983.

---

Michael M. Baylson, H. Buckley Cole, Philadelphia, Pa., for plaintiff.

Howard M. Klein, K. Robert Conrad, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Jurisdiction exists by virtue of ERISA's jurisdictional provision, 29 U.S.C. § 1132(e)(2). Plaintiff, Joan Kelly, is suing defendants, International Business Machines Corporation ("IBM") and its ERISA regulated IBM Total and Permanent Disability Income Plan (the "Plan"), for amounts allegedly due her under the terms of the Plan. Plaintiff also asserts pendent state claims against IBM for wrongful discharge and intentional infliction of emotional distress. Presently before the Court is defendants' motion for summary judgment on all counts of the complaint. For the reasons

set forth below, the motion will be granted.[1]

### FACTS

Plaintiff began working for IBM as an administrative trainee on April 19, 1976, and has been an associate administrative account specialist since December, 1977. On February 18, 1980, plaintiff called in sick due to fatigue, joint and muscle pain, malaise, and a low grade fever. She has not worked since.

When she did not return to work in February, 1980, plaintiff began receiving benefits under IBM's Sickness and Accident Income Plan ("S & A"). Plaintiff received S & A benefits until April 1, 1981,[2] when her benefits under this plan expired. Thereafter and until February 8, 1982, plaintiff was afforded "special consideration payments" by defendants. These are payments made after S & A benefits are exhausted while IBM gives individual consideration to an employee's case. During the individual consideration period, IBM assesses the employee's medical condition and then makes a final determination as to whether the employee should either be (1) directed to return to work, or (2) awarded any benefits under the IBM Total and Permanent Disability Income Plan.

In the course of plaintiff's individual consideration period, she was evaluated by IBM physicians Dr. Krehl and Dr. Silverberg. Additionally, plaintiff's own physician, Dr. Utsinger, reported to IBM on plaintiff's condition. After receiving a final report from Dr. Silverberg, which took into consideration the views of Dr. Krehl and Dr. Utsinger, IBM informed plaintiff that she should return to work.

Upon receipt of this decision by IBM, plaintiff initiated an intercompany appeal through IBM's "Open Door" policy. The Open Door procedure provides employees who are dissatisfied with management decisions the opportunity to appeal those decisions to higher management. As part of its investigation into plaintiff's appeal, IBM had plaintiff examined by an independent physician, Dr. Rubin, and thereafter by a psychiatrist, Dr. Stern, and a psychologist, Alexander Simos, Ph.D. Dr. Silverberg reviewed the reports of these three independent doctors and again concluded that plaintiff should be directed to return to work. Based on Dr. Silverberg's assessment, plaintiff was told on December 29, 1981, that she should return to work on January 13, 1982. On January 6, 1982, plaintiff wrote to John Opel, then President and Chief Executive Officer of IBM, pursuant to her Open Door rights, challenging IBM's decision that she should return to work. After investigation of plaintiff's letter, Mr. Opel concluded that management's investigation of her concerns was fair and unbiased and that therefore she should return to work. A letter to this effect was sent to plaintiff on February 3, 1982. Plaintiff notified IBM on February 8, 1982, that her health wouldn't permit her to return to work. IBM, viewing plaintiff's position as an election to resign, informed plaintiff that her resignation was effective that same day, February 8, 1982. On February 12, 1982, plaintiff replied stating that she had elected to follow the advice of her physician that she not return to work under IBM's conditions and that she had not resigned but if she was no longer employed it was because IBM had terminated her.

Two months later, after reviewing the reports in her medical file, plaintiff again wrote Mr. Opel. In this letter dated April 4, 1982, plaintiff contended that the medical reports did not indicate that she could go back to work and further, that she was entitled to benefits under IBM's Total and Permanent Disability Plan. Upon investigation of these claims, IBM reached the following conclusions which it set forth in a letter to plaintiff dated May 24, 1982: (1) medical evidence established that plaintiff was able to return to work; (2) plaintiff

---

1. The appropriate standard against which a motion for summary judgment should be gauged is set out in *Federal Laboratories, Inc. v. Barringer Research Ltd.,* 696 F.2d 271 (3d Cir.1982).

2. Although defendants assert that plaintiff's S & A benefits expired on February 10, 1981, for the purposes of this motion only, they assume that the April 1, 1981 date is correct.

was ineligible for benefits since she was not totally disabled within the meaning of the Plan; and (3) even if disabled plaintiff did not have the requisite five years of service necessary to qualify for benefits under the Total and Permanent Disability Plan. Thereafter, plaintiff filed the instant suit against IBM and the Plan raising three claims for relief. Count I alleges that IBM and the Disability Plan violated plaintiff's rights under ERISA by denying her request for Total and Permanent Disability benefits. Count II, a claim brought under state law, alleges that IBM wrongfully discharged plaintiff in order to prevent her from exercising her right to receive benefits under the Disability Plan in violation of the public policy embodied in ERISA, and with malicious intent to harm her and to interfere with her contractual rights as an IBM employee. Count III, also brought under state law, alleges that IBM intentionally inflicted emotional distress on plaintiff by its handling of her claim for disability.

## DISCUSSION

### A. Denial of Benefits

■ The role of the Court in reviewing a denial of Plan benefits is quite limited. The appropriate standard of review to be applied to the Plan's decision is whether defendants acted in an arbitrary and capricious manner. The Court is not free to substitute its own judgment for that of the defendants in determining eligibility for Plan benefits. *Rosen v. Hotel and Restaurant Employees & Bartenders Union,* 637 F.2d 592, 596 n. 5 (3d Cir.1981), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981); *Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.,* 637 F.2d 357, 362 (5th Cir.1981), *cert. denied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); *Cawley v. NMU Pension and Welfare Plan,* 457 F.Supp. 301, 303 (S.D.N.Y.1978). *See also, Rosenthal v. National Life Insurance Co.,* 486 F.Supp. 1018 (S.D.N.Y.1980). This holds true regardless of whether the plaintiff is challenging a denial of benefits based on a disputed interpretation of the Plan's partic-

ular language and rules, or whether the plaintiff's challenge goes to application of a Plan provision or rule not in dispute to the facts of plaintiff's individual case. *See Rosen v. Hotel and Restaurant Employees & Bartenders Union, supra,* 637 F.2d at 596–597; *Gordon v. ILWU–PMA Benefit Funds,* 616 F.2d 433 (9th Cir.1980), *reh. denied; Bickel v. Long Term Disability Plan of Western Electric,* 541 F.Supp. 685 (E.D.Pa.1982).

■ Application of this standard to the present situation requires affirmance of the Plan's decision to deny plaintiff Total and Permanent Disability Income Plan benefits. Defendants' denial was based on two determinations: first, that plaintiff lacked the five years of service required for receipt of lifetime benefits under the Plan and second, that even assuming arguendo that plaintiff had sufficient service, plaintiff was not totally and permanently disabled within the meaning of the Plan. A review of the record leads the Court to conclude that the defendants' threshold determination that plaintiff did not meet the necessary service requirement was based on a reasonable interpretation of the Plan and was therefore neither arbitrary nor capricious. Accordingly, it is unnecessary to discuss whether the defendants' determination that plaintiff was not totally disabled would survive scrutiny upon judicial review.

IBM's Total and Permanent Disability Income Plan, found in the IBM employee handbook, "About Your Company," provides that:

> If you become totally and permanently disabled AFTER you have been with IBM for five or more years and you are younger than age 65, you are eligible for an income under this plan until age 65 and for your lifetime thereafter under the IBM Retirement Plan, and for other benefits under various company benefit plans.
>
> What is Disability
> An employee will be considered totally and permanently disabled by giving satisfactory proof that a disability from any

cause prevents the taking of any employment for pay or profit.

(underlining in original, emphasis through capitalization supplied).

As set forth earlier, plaintiff began working for IBM on April 19, 1976. Thus in order for her to be eligible for long term benefits her claimed total and permanent disability must have occurred after April 19, 1981. Plaintiff's position as reflected in her deposition testimony is that she had been totally and permanently disabled since February 15, 1980, her last day at work. Based on this testimony, plaintiff's disability clearly occurred before she had been with IBM for at least five years. IBM, however, allows a more generous interpretation of when total disability may be said to have occurred for purposes of determining years of service. Under IBM's interpretation, years of service includes any time during which an employee is receiving S & A benefits. This does not include time during which an employee received individual consideration benefits. In the present case it is undisputed that plaintiff's S & A benefits expired on April 1, 1981. Using this date as the appropriate point of reference, plaintiff had less than 5 years of service with IBM at the time she allegedly became totally disabled. Accordingly, she was and is ineligible for lifetime Total and Permanent Disability Income benefits. That plaintiff holds a belief that she had been with IBM for at least five years at the time of her separation from the company is immaterial and does not allow this Court to upset defendants' interpretation of the relevant date for determining years of employment prior to the onset of an alleged total disability.

### B. The State Law Claims

Plaintiff asserts state law claims for wrongful discharge and intentional infliction of emotional distress. The wrongful discharge count alleges that defendants fired plaintiff to prevent her from exercising her right to receive benefits under the Disability Plan. The emotional distress count alleges that defendants intentionally inflicted emotional distress on plaintiff by their handling of her claim for disability benefits. Defendants argue that these state law claims are preempted by § 514 of ERISA which provides that all state laws that "relate to" employee benefit plans are superseded. In response plaintiff denies that her claims relate to defendants' Benefit Plan within the meaning of § 514. She argues that at most the claims only indirectly involve the Plan and therefore they are not preempted. The Court agrees with plaintiff as to the emotional distress claim, and with defendants as to the wrongful discharge claim.

Section 514 of ERISA, 29 U.S.C. § 1144, provides in pertinent part:

(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

\*      \*      \*      \*      \*      \*

(c) For purposes of this section:

(1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

*Id.* (emphasis added).

In enacting this section, Congress expressly indicated that it intended to occupy the field of employee benefit plans. ERISA's sweeping language preempts all state laws which relate to employee benefit plans, not only state laws which attempt to directly regulate areas expressly covered by ERISA. *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208 (8th Cir.1981), *rehearing and rehearing en banc denied* (1981). As § 514 reflects, Congress "meant to establish pension plan regulation as exclusively a federal concern...." *Alessi v. Raybestos-Manhattan, Inc.*, 451

U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981).

■ Turning to plaintiff's state law claim for wrongful discharge, the Court notes that Congress has already provided a remedy for the type of wrong which this state claim embraces. In 29 U.S.C. § 1140 ERISA states that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, *or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan,* this subchapter, or the Welfare and Pension Plans Disclosure Act.... The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

*Id.* (emphasis added).

Since plaintiff's state claim addresses the same type of wrong prohibited by § 1140, and since ERISA explicitly preempts the field of employee benefit plans, it is clear and plain that the state law claim for wrongful discharge is preempted.

■ The emotional distress claim stands on different ground. There is no ERISA provision which affords a remedy for the intentional infliction of emotional distress in the handling of a claim for employee benefits. Nor can it be said that a state tort law regarding intentional infliction of emotional distress directly regulates an ERISA plan. If either of these situations were the case, the foreclosure of the state claim due to preemption would be obvious. The question which is presented here, however, is whether state laws regarding intentional infliction of emotional distress "relate to" ERISA employee benefit plans within the meaning of § 514.

In *Shaw v. Delta Air Lines, Inc.,* —— U.S. ——, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Supreme Court stated that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at ——, 103 S.Ct. at 2900. In a later footnote the Court expressly indicated that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." Suggesting such a situation, the Court cited *American Telephone and Telegraph Co. v. Merry,* 592 F.2d 118, 121 (2d Cir. 1979), which held that state garnishment of a spouse's pension income to enforce alimony and support orders is not preempted by ERISA. *Id.* at —— n. 21, 103 S.Ct. at 2901–02 n. 21.

After careful consideration this Court has concluded that the state law pertaining to intentional infliction of emotional distress falls into the category of state actions which impact upon ERISA benefit plans in too tenuous a way to be considered as "relating to" such plans. Admittedly, the occurrence of the complained of conduct, forming the basis for the state tort action, in the context of an application for ERISA benefits intimates a marginal effect on the standards governing administration of ERISA plans. Nonetheless, in view of Pennsylvania's restriction on recovery for emotional distress to situations involving intentionally "outrageous conduct," and considering the separate concerns of the federal scheme and the state tort law, this effect is too insubstantial to warrant preemption of the state law. The state's legitimate and important interest in protecting its citizens cannot be preempted on such a slim reed. Cf. *Farmer v. Carpenters,* 430 U.S. 290, 304–306, 97 S.Ct. 1056, 1065–1066, 51 L.Ed.2d 338 (1977) (§ 301 of the Labor Management Relations Act, 29 U.S.C. § 185, does not preempt claims of intentional infliction of emotional distress).

The only other court to address the effect of § 514 on a state claim for intentional infliction of emotional distress based on the denial of benefits under an ERISA plan reached the same conclusion. In *Provience v. Valley Clerks Trust Fund,* 509 F.Supp.

388 (E.D.Cal.1981), the court reasoned that since the state law on intentional infliction of emotional distress has only an indirect effect on ERISA plans, and is a law of general application involving a matter of important state concern, there is no pre-emption. *Id.* at 391 (citing *American Telephone and Telegraph v. Merry,* 592 F.2d 118, 2d Cir.1979). In view of the Supreme Court's most recent pronouncement in *Shaw,* this Court is satisfied that the interpretation of § 514 adopted both here and in the *Provience* decision is correct. Accordingly, defendants are not entitled to summary judgment on the intentional infliction of emotional distress claim on the ground that such a claim is preempted.

Having concluded that preemption does not bar plaintiff's pursuit of damages for emotional distress, the Court will exercise its discretion and assume jurisdiction over this pendent state claim to review the merits. *United Mine Workers v. Gibbs,* 383 U.S. 715, 716, 86 S.Ct. 1130, 1131, 16 L.Ed.2d 218 (1966). Plaintiff asserts that defendants intentionally inflicted emotional distress on her in their handling of her situation. Defendants argue that plaintiff has failed to establish the existence of an emotional distress claim as a matter of law. After reviewing the undisputed facts of record, the Court agrees with defendants.

Pennsylvania has implicitly adopted the definition of intentional infliction of emotional distress set forth in the Restatement (Second) of Torts § 46 (1965). *See D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 431 A.2d 966, 971 n. 8 (1981). Section 46 provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. Restatement (Second) of Torts § 46 (1965).

Thus, in order for plaintiff to have an actionable claim for intentional infliction of emotional distress she must establish that the defendants' conduct has been so extreme and outrageous that it could be characterized as utterly intolerable in a civilized community. *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1274 (3d Cir.1979). It is for the Court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so outrageous that recovery should be permitted. If reasonable minds could differ in their conclusions regarding outrageousness, the question becomes one for the jury. *Id.* at 1274.

Plaintiff claims that defendants' conduct in investigating her situation was so outrageous and extreme as to exceed the bounds of decency of a civilized community. On the undisputed material facts of this case, the Court concludes as a matter of law that reasonable minds could not differ in their finding that defendants' conduct was not outrageous. The fact that IBM gave extensive consideration to plaintiff's claim does not provide any basis for plaintiff to assert that she was subjected to outrageous conduct. Defendants had every right to carefully scrutinize employee claims of total disability before they grant the employee benefits under the Disability Plan. Moreover, under the procedure followed by defendants, plaintiff was afforded two appeals to higher management from the initial determination that she should return to work. This in itself evidences defendants' fairness and negates plaintiff's claim that defendants acted outrageously. Viewed in their entirety, defendants' evaluation and review procedures simply do not rise to the level of outrageous conduct. *See Lekich v. International Business Machines Corp.,* 469 F.Supp. 485 (E.D.1979) (IBM's dismissal procedure not outrageous as a matter of law). *Compare Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir.1979); *Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970). Accordingly, defendants are entitled to summary judgment on plaintiff's claim for emotional distress.

## CONCLUSION

The Court concludes that defendants are entitled to summary judgment on plain-

tiff's ERISA claim since their interpretation of the Plan language is not arbitrary and capricious. Additionally, defendant IBM is entitled to summary judgment on the pendent state claims for wrongful discharge and intentional infliction of emotional distress. The wrongful discharge claim is preempted by ERISA. The emotional distress claim, while not preempted, must be dismissed on defendants' summary judgment motion since the conduct complained of was not outrageous as a matter of law.

An appropriate Order will be entered.