John R. FOLZ, Plaintiff,

v.

MARRIOTT CORPORATION, and Marriott Hotel Corporation, Defendants.

No. 82–0219–CV–W–5.

United States District Court,
W.D. Missouri, W.D.

Aug. 31, 1984.

Stephen P. Dees, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiff.

Dennis D. Palmer, Shughart, Thomson & Kilroy, Kansas City, Mo., Carlton J. Trosclair, Asst. Gen. Counsel, Washington, D.C., for defendants.

ORDER AND MEMORANDUM

SCOTT O. WRIGHT, District Judge.

Plaintiff John R. Folz has brought this action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, alleging that his employer, the Marriott Corporation, terminated his employment as a hotel general manager because it was learned that the plaintiff suffered from multiple sclerosis. Plaintiff contends that Marriott discharged him to avoid the economic consequences that would result due to his continued participation in certain medical benefits plans self-funded by Marriott. Plaintiff claims that such conduct was in violation of ERISA § 510, 29 U.S.C. § 1140, and constituted a prima facie tort under Missouri law as stated in *Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo.App.1980). In addition, plaintiff claims that Marriott issued a false service letter in connection with his discharge in violation of Mo.Rev.Stat. § 290.140 (1978).

Jury trial was held, and a punitive damage award was returned in favor of the plaintiff on the service letter count in the amount of $250,000. In addition, plaintiff received a verdict of $100,000 under the prima facie tort theory. Pending before the Court is plaintiff's ERISA claim. For the following reasons, the Court concludes that Marriott violated plaintiff's rights under ERISA and that the plaintiff is entitled to remedies pursuant to this Court's equitable jurisdiction.

I. *Findings of Fact*

1. The Marriott Corporation is a corporation engaged in the hotel and restaurant business in the State of Missouri and throughout the world.

2. The Marriott Corporation owns and operates the Marriott Hotel at the Kansas City International Airport in Kansas City, Missouri (hereinafter KCI Hotel).

3. During the time period relevant to this case, the Marriott Corporation provided various employee benefit programs to its management employees, including a pension and profit-sharing plan, a deferred stock bonus plan, a sick leave plan, a medical benefits plan, a long-term disability and salary continuation plan, a stock option plan, and a life insurance plan.

4. Plaintiff was employed by Marriott from 1965 until July 17, 1981.

5. During the course of his employment, the plaintiff held numerous managerial positions with Marriott, culminating in the position of general manager of the KCI Hotel from November 18, 1977 until July 17, 1981.

6. During the term of his employment and at the time of termination of his employment with Marriott, plaintiff participated in or was a beneficiary of Marriott's employee benefit plans for management employees, including its pension and profit-sharing plan, stock bonus plan, medical benefits plan, long-term disability and salary continuation plan, sick leave plan and others. As an employee of Marriott, the plaintiff had rights or expectations of rights under these plans.

7. Marriott's personnel policies and procedures required that periodic written performance reviews be conducted with each management employee.

8. Until March 12, 1981, periodic written performance reviews of plaintiff's job performance rated his performance throughout the term of his employment as "competent" or better.

9. Prior to March 12, 1981, plaintiff had never been placed on probation, or told his performance was unsatisfactory.

10. Effective upon becoming general manager at KCI Hotel in November, 1977, plaintiff received a salary increase of

$39.50 (5%) per week. Effective November 18, 1978, plaintiff received a salary increase of $58.00 (7%) per week. Effective April 19, 1980, plaintiff received a salary increase of $62.50 (7%) per week.

11. Plaintiff's increase on April 19, 1980 was a merit increase which was granted even though it put plaintiff's salary over the maximum range set by Marriott for his position.

12. During his term as general manager of the KCI Hotel, plaintiff received annual bonuses in 1979 and 1980 which amounted to $7,500 and $3,800, respectively.

13. Between the time of plaintiff's job performance evaluation dated March 5, 1980, which rated his performance as "competent," and March 12, 1981, plaintiff had no discussions with his supervisors about his job performance, and plaintiff received no warnings or indications that his job performance was unsatisfactory in any way.

14. In January, 1981, plaintiff was diagnosed as suffering from "definite" multiple sclerosis.

15. In mid-January, 1981, plaintiff notified his supervisor, Lewis Sherer, Regional Vice President for Marriott, that plaintiff had multiple sclerosis.

16. Multiple sclerosis is a generally progressive disease of the nervous system.

17. While the effect of multiple sclerosis on any individual cannot be predicted with certainty, the disease is often characterized by multiple episodes of exacerbation and remission. Over a ten-year period, one-third to one-half of individuals who are diagnosed as having definite multiple sclerosis will be incapacitated from performing gainful employment outside the home.

18. Sherer was aware that multiple sclerosis was an incurable disease. He identified multiple sclerosis with muscular dystrophy, which he understood was a crippling disease.

19. Sherer informed his immediate supervisor, Marriott's senior Vice President Paul Reed, that plaintiff was suffering from multiple sclerosis.

20. Sherer and Reed made the decisions to place plaintiff on probation and to terminate his employment.

21. On March 12, 1981, Sherer met with plaintiff and presented plaintiff with a written "management development appraisal form" which had been filled out in advance, rating plaintiff's job performance as unsatisfactory and placing plaintiff on ninety-day probation.

22. The "management development appraisal form" is required by Marriott's written personnel policy to be filled out on each management employee each year, in addition to a written performance evaluation. A management development appraisal form, however, had not been filled out on plaintiff since May, 1977.

23. During the meeting on March 12, 1981, Sherer informed plaintiff that plaintiff would be terminated from Marriott thirty days after the end of the ninety-day probation period.

24. Marriott has a written policy governing implementation of probation for managers. According to the written policy, the purpose of probation is to retrain or further develop managers whose performance is below satisfactory standards.

25. The Marriott policy governing probationary managers requires that the probationary manager's supervisor meet at least weekly with the probationary employee regarding the manager's performance and progress and that "every effort should be made to lend support and direction to the manager."

26. From March 12, 1981 until May 15, 1981, plaintiff's supervisor Lewis Sherer did not at any time counsel with plaintiff or discuss plaintiff's performance or his probationary status, either in person or by phone.

27. In April, 1981, the KCI Hotel was for the first time awarded a four-diamond rating by the American Automobile Association (AAA). This is the highest award granted by the AAA and is granted only to those hotels which significantly exceed

AAA requirements in most physical and operational categories.

28. In April, 1981, Marriott's senior Vice President Paul Reed prepared a report on his April trip to the KCI Hotel, which Lewis Sherer considered a favorable report about the KCI Hotel.

29. Although one of the subjects of criticism on the March 12, 1981 appraisal form was plaintiff's alleged poor listening ability and speech habits, Sherer admitted that plaintiff's communications with Sherer after March 12, 1981 were clear and understandable.

30. On May 15, 1981, in a meeting between plaintiff and Sherer, Sherer started the meeting by inquiring about plaintiff's efforts to find other employment. Sherer then told plaintiff nothing had changed since their last meeting on March 12, 1981, and asked plaintiff how he wished his separation from Marriott's employment to be handled.

31. On May 29, 1981, during a meeting between Lewis Sherer and plaintiff at the KCI Airport, Sherer informed plaintiff that if plaintiff did not resign his employment, Marriott would demand his resignation.

32. Other general managers who have been placed on probation for alleged poor performance have been given the opportunity during probation to improve their performance and to return to their position as general manager or to transfer to another position with Marriott. These included an individual who completed his three-months probation commencing September, 1978, and continued as general manager at his hotel; another individual who completed his two-months probation commencing September 4, 1981, and was thereafter demoted to a position at defendant's New York national sales office; and a third individual who completed his three-months probation and thereafter was transferred as general manager to another hotel.

33. Plaintiff was treated disparately from other general managers placed on probation for alleged poor performance in that plaintiff was not given the opportunity to improve his performance and remain employed by Marriott, and in that Marriott did not follow its written policy governing implementation of probation for managers.

34. Marriott's medical benefits plan is self-funded by Marriott as it is financed by contributions from participating employees and Marriott itself, with Marriott contributing from its general assets whatever funds are necessary in addition to participants' contributions to meet plan expenses each plan year. Marriott pays approximately 60% of plan costs.

35. Marriott's sick leave plan provides continuing compensation for employees absent from work due to illness.

36. Marriott's long-term disability and salary continuation plan provides continuing compensation for a disabled employee of 60% of his or her salary, up to a level of $750 per week, from the time the employee becomes disabled until age 65. This plan is self-funded by defendant.

37. Marriott's pension and profit-sharing plan, which prior to January 1, 1982 provided for full vesting for a participating employee only upon attainment of twenty years continuous service, was amended in April, 1981, to be effective January 1, 1982, to provide for full vesting upon attainment of fifteen years continuous service.

38. Plaintiff was terminated from Marriott's employment after the decision to reduce the vesting requirements of the profit-sharing plan, but prior to the effective date of the change, with the result that plaintiff lost at least $21,000 in non-vested benefits from the profit-sharing plan.

39. At the time of plaintiff's termination of employment by Marriott, plaintiff had been awarded future rights to approximately 1500 shares of defendant's stock under Marriott's deferred stock bonus plan. Of these shares, 501 were vested, subject to award upon retirement from Marriott, or in the event of prior termination of employment, attainment of age 55. The plan, however, provided that employment by a competitor of Marriott prior to award of

the vested shares terminated an individual's entitlement to the vested shares.

40. At the time of the termination of his employment, plaintiff was 51 years of age. Had plaintiff remained employed by Marriott past age 55, plaintiff would have been entitled to an award of all vested shares pursuant to the provisions of the deferred stock bonus plan.

41. Upon termination of his employment by Marriott, plaintiff sought employment suited to his training and experience, and was employed as general manager by another hotel chain, Brock Hotels. Under Marriott's stock bonus plan, employment by a competitor results in loss of all vested stock bonus shares.

42. At the time of termination of plaintiff's employment, plaintiff had been awarded stock options of 450 shares of defendant's stock exercisable on fixed dates at fixed prices if still employed. Plaintiff was unable to exercise the options because of the termination of his employment prior to the option dates.

43. The weight of the credible evidence established that in terminating plaintiff's employment, Marriott was motivated solely by the realization that plaintiff's disease could lead to increased illness and possible incapacity, and the desire to avoid the adverse economic impact which that disease could have under Marriott's employee benefit plans.

44. Marriott's stated reasons for terminating plaintiff's employment, i.e., poor performance as a general manager and alleged prior warnings concerning poor performance, were pretexts for plaintiff's discharge.

45. Marriott's disparate treatment of plaintiff is further demonstrated by Marriott's admitted failure to consider plaintiff for any other position with Marriott besides general manager despite plaintiff's established expertise and years of outstanding service in food and beverage positions. The uncontradicted evidence established that other Marriott general managers and employees accused of poor performance

have been given the opportunity to transfer back to their prior positions.

## II. *Conclusions of Law*

This Court possesses subject-matter jurisdiction pursuant to 29 U.S.C. § 1132(e)–(f). To the extent the plaintiff has advanced non-ERISA claims, this Court has pendent jurisdiction.

### A. *Liability Under ERISA*

Marriott is an employer engaged in an industry or activity affecting commerce within the meaning of 29 U.S.C. § 1002(5) and (12). Marriott's employee benefit plan, including its pension and profit-sharing plan, sick leave plan, long-term disability and salary continuation plan, medical benefits plan, deferred stock bonus plan, and stock option plan, are "employee benefit plans" within the meaning of 29 U.S.C. § 1002(4) and 29 U.S.C. § 1140. The plaintiff, during his employment with Marriott and at the time of his termination of employment by Marriott, was a "participant" or "beneficiary" in Marriott's employee benefits plan within the meaning of 29 U.S.C. § 1002(7)–(8), and 29 U.S.C. § 1140.

ERISA provides that:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or *for the purpose of interfering with the attainment of any right to which such participant may become entitled* under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. . . .

29 U.S.C. § 1140 (emphasis added). ERISA further provides that a civil action may be brought by a participant to recover benefits due him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan, 29 U.S.C. § 1132(a)(1)(B). An action may be brought by a participant to enjoin any act or practice which violates any provision of ERISA

or the terms of the plan or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan. 29 U.S.C. § 1132(a)(3).

The allegation that an employee was discharged from his employment for the purpose of depriving him of continued participation in the employer's company-provided insurance program states a cognizable claim under § 510 of ERISA. *Kross v. Western Electric Co., Inc.*, 701 F.2d 1238, 1243 (7th Cir.1983). Congress intended ERISA to remedy a broad range of problems in the field of employee benefit plans. *Id.* ERISA's legislative history states as follows:

POLICY OF 'EMPLOYEE BENEFIT SECURITY ACT'

Underlying the provisions of this Act is a recognition of the necessity for a comprehensive legislative program dealing not only with malfeasance and maladministration in the plans, or the consequences of lack of adequate vesting, but also with the broad spectrum of questions such as adequacy of funding, plant shut downs and plan terminations, adequate communication to participants, and, in short, the establishment of certain minimum standards to which all private pension plans must conform if the private pension promise is to become real rather than illusory.

H.R.Rep. No. 533, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Ad. News 4639, 4647–48.

ERISA is to be liberally construed in favor of employer benefit fund participants. *Kross, supra*, 701 F.2d at 1242. Congress designed § 510 to protect the employment relationship that gives rise to an individual's pension rights, and its "prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980).

Marriott contends that the plaintiff was discharged for cause. Specifically, Mar-riott suggests that the plaintiff's employment as General Manager of the KCI Marriott was terminated because of his poor performance and prior warnings concerning poor performance. This Court's review of the evidence, however, compels the conclusion that Marriott's arguments are mere pretexts for the plaintiff's discharge.

Initially, the Court draws the inference of illegal motive from the timing of the plaintiff's discharge. In the middle of January, 1981, the plaintiff notified his supervisor that he had multiple sclerosis. Approximately two months later, plaintiff was notified of his termination. The plaintiff was discharged despite his longstanding employment with Marriott of eighteen years and despite the fact that the plaintiff previously had always received job performance reviews of "competent" or better. Prior to March 12, 1981, the plaintiff had never been informed by Marriott that his performance was considered to be unsatisfactory. Moreover, plaintiff consistently received salary increases as General Manager of the KCI Hotel, and as recently as April of 1980 the plaintiff was granted a merit increase in pay even though it raised plaintiff's salary over the maximum salary range set by Marriott for the position of General Manager.

The Court also draws the inference of illegal motive from the manner in which plaintiff's probationary status was handled by Marriott. It was Marriott's standard practice to give General Managers placed on probation for poor performance the opportunity to improve their performance and return to their position as General Manager or transfer to another position. Marriott, however, did not follow its written procedures regarding probation for managers as the plaintiff was not given the opportunity to improve his performance and remain with Marriott.

Finally, the Court notes that there was a substantial economic incentive for Marriott to discharge the plaintiff. Marriott's medical benefits plan is self-funded by Marriott, as the fund is financed by contributions from participating employees and Marriott,

with Marriott providing approximately 60% of the costs of the plan. In addition, Marriott's sick leave plan provided continuing compensation for employees absent due to illness, and Marriott's self-funded long-term disability and salary continuation plan provided continuing compensation for disabled employees up to $750 per week from the onset of disability to the time the employee reaches the age of 65. In addition, the timing of plaintiff's discharge cost him at least $21,000 in non-vested benefits from Marriott's profit-sharing plan.

■ In conclusion, the purpose behind Marriott's discharge of the plaintiff was to deny the plaintiff the advantages of certain employee benefit plans. This finding is supported by the timing and handling of the plaintiff's termination, the plaintiff's long history of good performance evaluations, and the obvious financial motivations for Marriott to discharge the plaintiff. "The inescapable inference is that an ulterior motive lay behind defendants' maneuvers, and that a speedy discharge, before [plaintiff's] .. pension vested, was aimed at. The reasons given for his discharge were pretexual and the true purpose was to deprive him of his impending pension rights. This is the kind of conduct ERISA was enacted to prevent." *Ursic v. Bethlehem Mines*, 556 F.Supp. 571, 575 (W.D.Pa. 1983), affirmed in relevant part 719 F.2d 670 (3d Cir.1983).

### B. *Remedy*

Marriott contends that relief under ERISA should be limited to reinstating the plaintiff as a benefit plan beneficiary, and that reinstatement to employment and back pay are not appropriate remedies. In support of its theory, Marriott reasons that ERISA was designed to protect retirement income and not salary and wages. A review, however, of the relevant statutory language, legislative history and case law compels the conclusion that this Court's equitable power under ERISA is broad enough to recreate the circumstances that would have existed absent an employer's illegal conduct.

The language of ERISA specifically provides that a plaintiff may bring an action to enjoin any act or practice in violation of the statutory requirements or "to obtain *other appropriate equitable relief*" to redress ERISA violations. 29 U.S.C. § 1132(a)(3) (emphasis added). Moreover, ERISA's legislative history indicates that the Court has broad equitable power.

> The enforcement provisions have been designed specifically to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of the Retirement Income Security for Employees Act as well as the amendments made to the Welfare and Pension Plans Disclosure Act. The intent of the Committee is to *provide the full range of legal and equitable remedies* available in both state and federal courts and to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities under state law or recovery of benefits due to participants.

S.Rep. No. 93–127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News at 4871 (emphasis added). It was the intent of Congress to enact safeguards to preclude the "type of abuse [prohibited by § 510] from being carried out and in order to completely secure the rights and expectations brought into being by this landmark reform legislation." S.Rep. No. 93–127, 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News at 4833, 4872. Accordingly, it is apparent that Congress "intended ERISA to remedy a broad range of problems in the field of employee benefit plans," and that "ERISA is a remedial statute to be liberally construed...." *Kross, supra*, 701 F.2d at 1242.

■ With respect to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, the Eighth Circuit has stated that the purpose of the Act "is to make persons whole for injuries suffered as a result of unlawful employment discrimination." *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1097 (8th Cir.1982). In framing

equitable relief for ADEA violations, trial courts should, to the extent possible, attempt to make aggrieved individuals whole for injuries sustained as a result of unlawful employment practices, and should attempt to implement the ADEA's purpose of " 'recreating the circumstances that would have existed but for the illegal discrimination.' " *Dickerson v. DeLuxe Check Printers, Inc.*, 703 F.2d 276, 279 (8th Cir.1983), *quoting Gibson, supra*, 695 F.2d at 1097.

■ Similarly, regarding Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Eighth Circuit has noted that one of the central purposes of this statutory framework is to make victims whole for injuries caused by illegal employment discrimination. *Locke v. Kansas City Power & Light Co.*, 660 F.2d 359, 367 (8th Cir. 1981). To effectuate this "make whole" purpose, federal courts are vested with broad equitable discretion to order affirmative action, including reinstatement, back pay or other appropriate equitable relief. *Harper v. General Grocers Co.*, 590 F.2d 713, 717 (8th Cir.1979).

■ Generally, equitable relief ordered by a district court is subject to review only for an abuse of discretion. *Id.* Like Title VII and the ADEA, ERISA is a broad remedial statute and is entitled to a liberal construction. *See Kross, supra*, 701 F.2d at 1283. Accordingly, the discretion of the trial court in awarding equitable relief under ERISA, although not unlimited, must be exercised consistently with the strong remedial aims of ERISA. A careful review of the pertinent statutory language and legislative history of ERISA, along with a comparison of ERISA to similar remedial statutes, leads this Court to conclude that its equitable power under ERISA is not limited to mere reinstatement of pension plan benefits. Rather, the Court concludes that it has the equitable power under ERISA to put the plaintiff "back into the position he enjoyed before the discharge. This includes awarding plaintiff back pay, reinstatement to his former position, restitution of his forfeited employee's benefits, and any other relief necessary to make him whole." *Bittner v. Sadoff & Rudoy Industries*, 490 F.Supp. 534, 536 (E.D.Wis.1980) (construing ERISA).

**(1) *Back Pay***

■ The Eighth Circuit has approved the year-by-year approach for the calculation of back pay. *Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 693 (8th Cir.1983). The calculation of back pay requires a determination of the difference between the plaintiff's actual earnings during the relevant period and the earnings lost as a result of the illegal conduct. *See id.; T & S Service Associates, Inc. v. Crenson*, 666 F.2d 722, 728 (1st Cir.1981) ("In the case of an injury of an economic nature, the injured party is to be placed as near as possible in the situation he would have been in had the wrong not occurred.") This calculation includes "back pay from the date of discharge to the present and any increases [the plaintiff] would have received within that period." *Paxton v. Union National Bank*, 688 F.2d 552, 574 (8th Cir.1982). An award of back pay also should include any bonuses and fringe benefits the plaintiff would have recovered had he remained employed by the defendent. *Id. See also Hawkins v. Anheuser Busch, Inc.*, 697 F.2d 810, 817 (8th Cir.1983) (Title VII case remanded for a determination of back pay including reasonably inferred salary increases).

■ In addition, a trial court may award pre-judgment interest on back pay where it finds that the back pay recovery is reasonably capable of being ascertained at the time of the illegal act and that the back pay recovery would not be complete and the plaintiff would not be made whole without pre-judgment interest. *Behlar v. Smith*, 719 F.2d 950, 954 (8th Cir.1983). The Court has reviewed the evidence in light of this standard and concludes that pre-judgment interest on the back pay award is justified, as an award of pre-judgment interest is necessary in order for a plaintiff to obtain appropriate equitable relief under ERISA. *See Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1219

(8th Cir.1981). Pursuant to Mo.Rev.Stat. § 408.020, pre-judgment interest in Missouri is to be computed at the rate of nine percent per annum for periods after September 28, 1979. *Dependahl, supra,* 653 F.2d at 1220.

Finally, the Court notes that although the plaintiff has the burden of proving entitlement to and the amount of back pay, "back pay should be awarded even where the precise amount of the award cannot be determined," and "any ambiguity should be resolved against" the employer. *Rasimas v. Michigan Department of Mental Health,* 714 F.2d 614, 628 (6th Cir.1983). *See also Marable v. Walker,* 704 F.2d 1219, (11th Cir.1983) (that amount of damages is incapable of exact measurement does not bar recovery under Fair Housing Act, 42 U.S.C. § 3601 *et seq.,* and the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.*).

The plaintiff was receiving an annual salary of $49,600 (approximately $950 per week) at the time of his discharge. Plaintiff's salary was discontinued on July 17, 1981, and the plaintiff received severance pay for eight weeks thereafter. The plaintiff worked for Brock Hotels from August 31, 1981 through July 2, 1982 at an annual salary of $42,500 ($817.30 per week). Plaintiff then was employed by the Kansas City Club from August 31, 1982 until August, 1983, where plaintiff was paid $40,000 annually plus $1,200 in bonuses for the first six months of employment ($792.31 per week). After six months, plaintiff received an annual salary of $45,000 ($886.46 per week) from the Kansas City Club. Since March 21, 1984, the plaintiff has been employed and has received an annual salary of $40,000 ($769.23 per week).

The evidence established that the plaintiff received regular annual salary increases during his employment by Marriott. The plaintiff received a salary increase of 5% in November, 1977, and increases of 7% in November, 1978, and in April, 1980. These increases were consistent with Marriott's written guidelines for salary increases for managerial employees. Accordingly, the Court finds that the plaintiff would have received an annual salary increase of approximately 5% in April of 1981–84.

In addition, the plaintiff was awarded annual bonuses prior to his termination pursuant to Marriott's established bonus policy. The plaintiff received a $7,500 bonus in 1979 and a bonus of $5,000 in 1980. Accordingly, the Court finds, based on Marriott's bonus policy, that the plaintiff would have received annual $5,000 bonuses for 1981–1983.

Pursuant to these findings, this Court makes the following calculations. Interest calculations will be computed based on the midpoint of the relevant period.

1. *Calculations for 1981*

a. Actual earnings—$22,311 consisting of:

(i) $7,600 in severance pay (8 weeks x $950 per week); and

(ii) $14,711 earnings from Brock Hotel (18 weeks x $817.30 per week from August 31, 1981 to December 31, 1981).

b. Lost Marriott compensation—$29,652 consisting of:

(i) $22,800 base salary prorated from $49,600 annual rate (24 weeks x $950 per week from July 14, 1981 through December 31, 1981); and

(ii) $1,852 projected salary increase effective April 1, 1981 (39 weeks x $47.50); and

(iii) $5,000 projected annual bonus

2. *Calculations for 1982*

a. Annual earnings—$37,504 consisting of:

(i) $21,250 earnings from Brock Hotel (26 weeks x $817.30 per week); and

(ii) $15,054 earnings from Kansas City Club (19 weeks x $792.31); and

(iii) $1,200 allowances from Kansas City Club.

b. Lost Marriott compensation—$59,030 consisting of:

(i) $52,080 base salary; with projected increase; and

(ii) $1,950 projected salary increase as of April 1, 1982 (39 weeks x $50); and

(iii) $5,000 projected annual bonus.

3. *Calculations for 1983*

a. Actual earnings—$30,367 consisting of:

(i) Kansas City Club salary of $5,546 (7 weeks x $792.31 per week) plus $24,821 (28 weeks x $886.46 per week).

b. Lost Marriott compensation—$61,751 consisting of:

(i) $54,684 base salary with projected raise;

(ii) $2,067 projected salary increase effective April 1, 1983 (39 weeks x $53); and

(iii) $5,000 projected annual bonus

4. *Calculations for 1984*

a. Actual earnings—$15,385

($40,000 annual salary: $769.23 per week x 20 weeks)

b. Lost Marriott compensation—$36,373 consisting of:

(i) $35,328 ($57,418 base salary including projected annual raise: $1,104 per week x 32 weeks) effective date of calculation August 11, 1984; and

(ii) $1,045 projected salary increase effective April 1, 1984 (19 weeks x $55)

Back Pay Calculations

| Year | Lost Compensation | Actual Income | Differential | Back Pay (with interest) |
|------|------|------|------|------|
| 1981 | $29,652 | $22,311 | $ 7,341 | $ 9,114 |
| 1982 | $59,030 | $37,504 | $21,526 | $25,047 |
| 1983 | $61,751 | $30,367 | $31,384 | $33,502 |
| 1984 | $36,373 | $15,385 | $20,988 | $21,014 |
| | | | Total Back Pay | $88,677 |

(2) *Reinstatement or Front Pay*

Marriott contends that reinstatement of the plaintiff to his former position is not appropriate because of hostility that exists between the plaintiff and Marriott management. Marriott suggests that the sensitive nature of the plaintiff's prior managerial position requires mutual trust and cooperation which would not be possible in light of the circumstances.

 Courts typically decline to reinstate plaintiffs where a high level, unique or unusually sensitive position in the de-fendant's organization is involved. *Dickerson v. DeLuxe Check Printers, Inc.,* 703 F.2d 276, 280 (8th Cir.1983). Courts also decline to reinstate plaintiffs because of evidence of extreme hostility existing between the parties prior to the litigation. *Id.* Because this case involves both an antagonistic relationship and a high level managerial position requiring constant communication and cooperation, this Court will not order the reinstatement of the plaintiff to his prior position with Marriott.

 In framing an award of equitable relief in an employment discharge case, the district court may consider an award of front pay. *Locke, supra,* 660 F.2d at 369 (Title VII case). The "equitable relief that the district court may grant includes, *inter alia,* additional pension benefits, reinstatement, and monetary damages in lieu of reinstatement." *Gibson, supra,* 695 F.2d at 1100. The Court considers such an award appropriate in this case as reinstatement is not feasible.

 The calculation of front pay covers the period from the date of judgment to the projected date of retirement. *See Blim v. Western Electric Co.,* 731 F.2d 1473, 1478 (10th Cir.1984). The amount equals the difference between the salary received at the time the judgment is entered and what the plaintiff should have made with his former employer until the assumed retirement date. *See id.* Although ordinarily front pay is discounted to present value, *see James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 358 (5th Cir.1977), the figure need not be discounted where reasonably equivalent expected salary increases are excluded from the compensation. *Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d 945, 957 (10th Cir.1980). The front pay formula should be consistent with the formula used by the Court to compute back pay. *Thompson v. Sawyer,* 678 F.2d 257, 292 (D.C.Cir.1982).

 Although it may be suggested that front pay in this case is inappropriate because the plaintiff is currently employed,[1]

---

**1.** *See E.E.O.C. v. Safeway Stores, Inc.,* 634 F.2d 1273, 1281 (10th Cir.1980) (front pay covers

the Court concludes that complete relief will not be afforded unless the plaintiff is compensated for lost future wages. An award of front pay is available to the Court to achieve the broad purpose of eliminating illegal employment practices and restoring the plaintiff to the position he would have maintained had the prohibited conduct not taken place. *Fitzgerald, supra,* 624 .F.2d at 957.

The plaintiff, who is 53 years old, would ordinarily be expected to work until the age of 65. No credible evidence was introduced at trial indicating that the plaintiff necessarily would be forced into an early retirement because of his medical situation. Rather, there was expert testimony that only one-third to one-half of those having multiple sclerosis for a period of ten years or more are unable to continue their occupational pursuits. Accordingly, the Court finds that the plaintiff's expected year of retirement is 1991, ten years from the date he was diagnosed as having multiple sclerosis.

To calculate plaintiff's front pay, the Court will determine the difference between the plaintiff's average actual income during periods of employment since his discharge [2] and the average projected annual salary plaintiff would have received from Marriott since his termination.[3] Because salary increases seven years in advance are unreasonably speculative, and because the present value factor would approximately offset potential salary increases, projected bonuses and raises will not be included in the back pay computation and the present value factor will not be involved. *See Fitzgerald, supra,* 624 F.2d at 957. Accordingly, the Court will award the following

amounts as front pay based on the annual differential of $11,570.50.[4]

(1) Balance of 1984: $4,450 (20/52 x $11,570.50 differential)

(2) 1985–1991: $80,993 (7 years x $11,570.50 differential)

Total front pay: $85,443

### (3) *Reinstatement of Lost Benefits*

As noted previously, ERISA specifically authorizes the plaintiff to seek "appropriate equitable relief" to remedy violations of ERISA. 29 U.S.C. § 1132(a)(3). In granting an award of equitable relief, the trial court should attempt to make individuals whole for injuries resulting from unlawful employment practices. *Dickerson, supra,* 703 F.2d at 279. In addition to back pay, reinstatement or front pay, an order of equitable relief may include forfeited employee benefits. *See Gibson, supra,* 695 F.2d at 1100; *Bittner, supra,* 490 F.Supp. at 536.

One benefit lost due to the termination in the instant case was plaintiff's stock options on 450 shares of Marriott stock. These options were awarded to the plaintiff prior to his discharge and were exercisable on fixed dates at fixed prices. The only prerequisite for the exercise of these options was plaintiff's continued employment on those dates. The plaintiff exercised all other stock options made available to him during his employment by Marriott. Accordingly, these lost stock option opportunities were a substantial part of plaintiff's compensation and will be restored to him.

In addition, at the time the plaintiff was discharged, the plaintiff had been awarded future rights to 1501 shares of Marriott stock under Marriott's deferred stock bo-

---

period "pending the claimants being able to secure their rightful place.").

**2.** Actual Annual Salary:

(1) $42,500 — Brock Hotel, 1981–1982
(2) $40,000 — Kansas City Club, 1982–1983
(3) $45,000 — Kansas City Club, 1983
(4) $40,000 — current salary
$167,500

Average Actual Salary: $41,875 ($167,500/4)

**3.** Expected projected Marriott salary:

(1) $49,600 — 1981
(2) $52,080 — 1982
(3) $54,684 — 1983
(4) $57,418 — 1984
$213,782

Average Projected Marriott Salary: $53,445.50 ($213,782/4)

**4.** Average projected Marriott salary of $53,445.50 minus average actual salary of $41,875.

nus plan. Of these shares, 501 were vested and subject to award upon retirement from Marriott or, in the event of prior termination of employment, upon attainment of the age of 55. In addition, with each successive year, plaintiff's vested shares were to be increased by a set amount. Although Marriott contends that plaintiff's employment by a competitor after his discharge voids his vested interest and terminates his entitlement to vested shares, it is the conclusion of the Court that the plaintiff's interest in the shares has not been terminated by his interim employment because plaintiff's subsequent employment was necessitated by Marriott's illegal discharge of the plaintiff. Accordingly, the plaintiff's rights under Marriott's deferred stock option plan will be restored.

■ At the time of his termination, the plaintiff was only partially vested in Marriott's profit-sharing plan, even though he had 16 years of service. In April of 1981, vesting requirements were modified to permit full vesting on reaching 15 years of continuous service. This change went into effect four months after plaintiff's discharge, and plaintiff's request to be included in this substantial policy modification was rejected by Marriott. The profit-sharing plan precisely defines the methods for determining employee and employer contributions to the plan, and the plan also provides for the allocation of forfeitures among the participants. As a result of his termination, the plaintiff lost the benefit of employer contributions, earnings and forfeitures to which he would have been entitled under the plan. Accordingly, Marriott is to restore to the plaintiff all contributions, earnings and forfeitures under the profit-sharing plan that the plaintiff lost as a result of the discharge, and Marriott is to give the plaintiff the full benefit of the 1981 pension plan amendment.

In addition to the above benefits, Marriott is directed to reinstate plaintiff's full seniority status as if the plaintiff had not been discharged. Marriott is to include the plaintiff, with full seniority rights, in its pension and profit-sharing plan, medical benefits program, sick-leave plan, long-term disability and salary continuation plan, and life insurance program.

### C. Preemption of the Prima Facie Tort Verdict by ERISA

Having found a violation of ERISA, the Court must now consider whether the plaintiff's prima facie tort claim is preempted by ERISA. "ERISA preempts state laws to the extent that they relate to employee benefits which are not exempt from federal regulation." *Dependahl v. Falstaff Brewing Corp., supra* 653 F.2d at 1214. *See* 29 U.S.C. § 1144. In enacting ERISA, Congress "saw the need to set minimum, uniform national standards for employee benefit plans and to provide for uniform remedies in the enforcement of the plans." *Dependahl, supra,* at 1215. "In doing so, Congress preempted all state laws which relate to employee benefit plans, not only state laws which directly attempt to regulate an area expressly covered by ERISA." *Id.*

■ In *Dependahl,* the Eight Circuit concluded that ERISA preempts state law claims for tortious interference with employee benefit plans. *Id.* at 1216. Similarly, state law claims for intentional and negligent infliction of emotional distress in connection with the handling of disability benefits are preempted by ERISA. *Russell v. Massachusetts Mutual Life Insurance Company,* 722 F.2d 482, 493 (9th Cir.1983). ERISA also preempts state common-law actions for unjust enrichment, fraud and conversion, *District 65, U.A.W. v. Harper & Row Publishers, Inc.,* 576 F.Supp. 1468, 1487 (S.D.N.Y.1983), as well as common law contract actions relating to employee benefits. *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan,* 575 F.Supp. 1073, 1077 (E.D. Wis.1983). A state law claim of wrongful discharge to prevent a former employee from receiving a disability pension is preempted by ERISA. *Delisi v. United Par-*

*cel Service, Inc.*, 580 F.Supp. 1572, 1575–76 (W.D.Pa.1984); *Kelly v. International Business Machines*, 573 F.Supp. 366, 371 (E.D.Pa.1983).

■ In the instant case, the plaintiff's prima facie tort theory was based on the proposition that Marriott discharged the plaintiff for the purpose depriving him of pension and medical plan benefits. Because this claim relates to employer benefits and because Congress has already provided a remedy for the conduct alleged, the Court concludes that the prima facie tort verdict is pre-empted by ERISA.[5]

### III. CONCLUSION

In accordance with the foregoing opinion, it is hereby

ORDERED that judgment is entered in favor of plaintiff John Folz and against defendant Marriott Corporation on the plaintiff's ERISA count. This judgment includes an award of back pay in the amount of $88,677, and an award of front pay in the amount of $85,443. It is further

ORDERED that Marriott include the plaintiff in its pension and profit-sharing plan, stock option programs, medical benefits program, sick-leave plan, long-term disability and salary continuation plan and life insurance program. The plaintiff is to receive coverage under these plans with the seniority status plaintiff would have achieved had he not been discharged from his employment with Marriott. It is further

ORDERED that Marriott is enjoined from interfering with plaintiff's rights under Marriott's employee benefit programs. It is further

ORDERED that the verdict and damage award based on plaintiff's prima facie tort claim is vacated. It is further

ORDERED that Marriott's motion for a new trial is denied. It is further

ORDERED that Marriott's motion for judgment notwithstanding the verdict is denied. It is further.

ORDERED that within fifteen (15) days of this order, the plaintiff is to submit an itemized statement of attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). The defendant may respond ten (10) days thereafter. It is further

ORDERED that the defendant shall bear the costs of this action.

---

**5.** The Court notes that Missouri courts apply the employment at will doctrine, under which an employer may discharge an at will employee with or without cause. *See Amaan v. City of Eureka*, 615 S.W.2d 414, 415 (Mo.1981). Marriott argues that the plaintiff's action for wrongful discharge based on the prima facie tort theory cannot be maintained because it is in conflict with the employment at will doctrine. *See Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 293, 448 N.E.2d 86, 91 (App.1983) (prima facie tort claim cannot be used to circumvent the unavailability of a tort claim for wrongful discharge). At least one Missouri court, however, has adopted the contrary position. In *Lundberg v. Prudential Insurance Company of America*, 661 S.W.2d 667 (Mo. App.W.D.1983), the appellate court implicitly recognized that the discharge of an at will employee may be actionable based on the prima facie tort theory. According to *Lundberg*, the trial court must balance the following factors to determine whether the employer's conduct was tortious: (1) the nature and seriousness of the harm to the injured party; (2) the interests promoted by the actor's conduct; (3) the character of the means used by the actor; and (4) the actor's motive. *Id.* at 671.