Donald J. FARR, et al., Plaintiffs,

v.

U.S. WEST, INC., et al., Defendants.

Civil Nos. 91–1186–MA (Lead Case) 92–330–MA and 92–485–MA.

United States District Court, D. Oregon.

Dec. 24, 1992.

Leslie Wellman, Shari Clark, Wellman & Murray, P.C., Portland, OR, for plaintiffs.

R. Erick Johnson, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, D. Ward Kallstrom, Lillick & Charles, San Francisco, CA, for defendants.

## OPINION

MARSH, District Judge.

In this consolidated action, plaintiffs allege that defendants breached fiduciary duties under ERISA by misrepresenting facts relating to tax consequences of an early retirement pension benefit program, by providing misleading information about those tax consequences, by failing to discover and disclose those adverse tax consequences in a timely fashion, and by failing to permit plaintiffs to rescind their elections.[1] Plaintiffs now move for summary judgment against defendants on their first claim for relief under ERISA and for summary judgment against several of defendants' affirmative defenses. Defendants have filed a cross motion for summary judgment against plaintiffs' ERISA claim. For the reasons that follow, plaintiffs' motions for summary judgment are denied and defendants' motion for summary judgment is granted.

---

1. On July 28, 1992, I issued an opinion holding that plaintiff Farr's five state law claims for breach of contract, breach of fiduciary duties, fraud, negligent misrepresentation and a statutory wage claim were preempted by ERISA.

## BACKGROUND

The parties agree that the U.S. West Pension Plan is a "tax-qualified" defined benefit retirement plan governed by Section 401(a) of the Internal Revenue Code of 1986 and ERISA.[2] Paragraph 4.9 of the plan anticipates that there may be instances in which certain benefits may exceed I.R.C. § 415 limits:

"The portion of any pension or survivor annuity with respect to any participant in excess of the applicable [I.R.C. § 415] limit shall be paid by the Participating Company which last employed such participant, directly to the participant or beneficiary entitled thereto and shall be charged to its operating expense accounts."

In November of 1989, the U.S. West Board of Directors adopted the "5+5 Amendment" to paragraph 4.9 of the plan in an effort to streamline the management workforce by encouraging early retirement. Under the 5+5 Amendment, eligible plan participants could add five years to their age and five years to their period of service for the purpose of calculating their pension benefits. According to the letter issued by Thomas Bouchard to the employees on December 15, 1989, this program was designed to "accelerate pension eligibility and increase pension amounts for qualified participants." Included as part of the 5+5 program was an option that eligible participants who retired in January of 1990 could elect to receive a special "lump sum" benefit calculated at present value including a 15% supplement and death benefit equal to one year's salary.[3] Company provided medical, dental and basic life insurance benefits would continue without interruption. Eligible employees had to make their election by January 31, 1990 and their decision, once made, was "irrevocable."[4]

On December 15, 1989, Bouchard sent a letter to the approximately 6,000–7,000 eligible employees and included an "overview" of the 5+5 program. The overview described eligibility requirements, how benefits would be calculated, payment options (monthly or lump sum) and included a section entitled "Tax Considerations Affecting Choice of Distribution." The tax section notes that it is intended to "highlight" basic federal tax rules, that tax considerations will play an important role in making pension decisions and includes the following caution:

"Beware: The tax consequences of the options available to you from the U.S. West Management Pension Plan at termination of employment are complex. To insure you have a complete understanding of these tax consequences, you should consult with your tax advisor. For example, certain very large distribution (e.g. over $750,000) may be subject to excise taxes in addition to regular taxes."

In addition to the written materials delivered to employees in December of 1989, defendants also provided a toll-free "hot-line" number to field questions about the program and conducted a live telecast presentation on January 17, 1990. During the question-and-answer session of the program, Charles Kamen, the benefits coordinator, responded to a question about the possibility of a 10% excise tax if funds were distributed prior to the age of 55. Kamen indicated that the excise tax could be avoided by making a "timely rollover of the qualified portion of your distribution." In response to a compound question about the ability to rollover lump sum payments of savings, pension and profit sharing

---

2. On July 30, 1992 I held that the excess benefit provisions in defendants' early retirement plan did not constitute a separate excess benefit plan which is exempt from ERISA, and that plaintiffs' claims challenged administrative activities of plan fiduciaries. Thus, I dismissed plaintiffs' alternative state common law claims on the basis that they "related" to the administration of an ERISA plan and thus, were preempted by ERISA.

3. The overview defines "present value" as "the total sum that must be paid to an individual today and invested at a specified interest rate in order for it to earn enough for the individual to have the same monthly payment for his/her remaining lifetime based on mortality tables as if the money were to have been left in the pension plan."

4. Judith Osse, a member of the pension administration who worked directly with the 5 + 5 program, testified in her deposition that the committee did in fact allow employees to rescind their election for "hardship" reasons. Osse Deposition at 39. These rescissions were only available upon request however, and the committee did not make this option generally known. *Id.*

(PAYSOP), Kamen again responded that, to the extent these payments "qualify" they could be rolled over. Kamen did not elaborate on exactly what constituted "qualified" benefits, nor did he explain the possibility that a portion of the 5 + 5 lump sum distribution could be "non-qualified," but later in the program, he did reiterate that "as to specifics, it's generally much better to have your own personal tax advisor, your own CPA, your own professional give that advice."

Plaintiffs were participants in the U.S. West deferred compensation pension plan who retired under the "5+5 Amendment" and elected to receive lump sum payments in excess of normal pension benefits they would have received under the plan had they not elected early retirement. It is uncertain whether plaintiffs' positions would have been eliminated but for the adoption of the 5+5 early retirement program. Plaintiffs received lump sum distributions upon severance ranging from $265,735.20 to $491,069.22 each. For each plaintiff, the majority of this distribution was from "qualified plan" trust assets and could be rolled over into a tax deferred investment vehicle, such as an IRA. However, each plaintiff discovered that a portion of their lump sum distribution could not be rolled over because it exceeded IRC § 415 limits. For example, plaintiff Gregory Ishmiel received a lump sum distribution of $265,735.20 of which $42,278.39 was "non-qualified" and exceeded IRC § 415 limits. Plaintiff Rod Tracy received a lump sum of $491,069.22 of which $176,278.56 was "non-qualified," could not be rolled over into an IRA. All "non-qualified" distributions were subject to immediate taxation.

Gene Wickes, an actuary with Towers Perrin in Denver, Colorado, hired to assist the Pension Committee, testified in his deposition that he was aware of the potential § 415 issue in early January, 1990, but that he felt the number of people who might be affected by the limits was relatively small. The company had projected that approximately 30% of employees eligible to participate would exercise the option, and Wickes testified that they felt the number of younger employees most likely to be affected by the § 415 limits would be particularly small because only a few of the younger employees were expected to find early retirement attractive.

Wickes, Bouchard and members of the pension committee were surprised to discover that, as of February 1, 1990, almost 67% of a pool of approximately 7,000 eligible employees had exercised the early retirement option under the 5+5 Amendment. Wickes and Bouchard also testified that they were astounded at the large figures generated by the lump sum formula. Kamen testified that although he was generally aware of § 415 limits on distributions, that in preparing program materials he "assumed that the majority of distributions would be qualified, that there would probably be a few isolated incidences where § 415 would be exceeded, but they would be insignificant in amount and in number." Kamen deposition, at 31. Specifically, Kamen felt that less than a dozen employees might be affected. *Id.*, at 32.

Wickes testified that in January of 1990 he received a phone call from Jim Downs, an acting controller for U.S. West, about his lump sum payment and his intent to roll the full amount into an IRA. Wickes testified that this was the first time he realized the significance of the potential impacts of the returns on the elections and the fact that Downs and others like him would probably not be able to rollover such large distributions. Immediately following this discussion with Downs, Wickes contacted Charles Kamen, who had overall responsibility for corporate benefit matters, and told him about Downs' situation and expressed concern about the possibility that there were others similarly situated. Wickes then prepared a computer program to commence a search for others who would receive excess benefits which could not be rolled over into a tax deferred vehicle. Gathering necessary data on each individual and computing estimated excess, non-qualified benefits took approximately six to eight weeks.[5]

5. According to Wickes, several different factors went into these computations including the employees' payment history for the last 5 years, total number of years worked, age at election and the total amount saved in the employees' savings plan account. Because year end "team

However, on February 6, 1990, prior to Wickes' compilation of the final list of employees affected by § 415 benefit limitations, the pension committee met to determine how to address the § 415 concern. Wickes had recommended amending the plan and reducing the discount rate of 8% to 5.25% for the non-qualified portion of the distribution. In his deposition, Wickes explained the basic rationale behind the downward adjustment:

> "The fact that you have to pay tax on the interest every year means that you have to have more principal because you have less interest. That's why a lower interest rate was used for the discounting—to reflect the fact that you weren't going to get nearly as much interest—because it couldn't, in that regard, be sheltered. You have to pay tax on the earnings every year.
>
> Q. So, by using a lower discount rate, you get a larger principal to start with?
>
> A. Correct."

Thus, the 5.25% did not adjust for the fact that an employee had to pay taxes up front, but instead adjusted for the fact that they would have to pay tax on interest by giving them a larger lump sum in the year of distribution: "It was designed to make one present value equivalent to an annuity." Wickes Depo at 131. Thus, the adjustment was designed to offset losses on the future income stream, not to provide a dollar for dollar offset against immediate tax liabilities. The Committee adopted Wickes' recommendation and amended the 5+5 plan to apply a 5.25% discount rate to the non-qualified distributions.

On February 28, 1990, each plaintiff received a statement of estimated benefits which calculated estimated monthly benefits under one option and estimated lump sum benefits under "option 2."

On March 5, 1990, plaintiffs received a letter from Jack Shea, Executive Director of Benefits, informing them of the § 415 limita-tion on the non-qualified portion of their lump sum distribution and advising them of the specific portion of their distribution which was non-qualified and could not be rolled over.[6] In addition, the letters notified plaintiffs of the Committee's decision to adjust the discount rate from 8% to 5.25% which resulted in an increase in their lump sum distributions. "Finalized" statements of benefit calculations were sent to plaintiffs April 21—April 27, 1990.

Thereafter, plaintiffs Farr, Rader, Tracy and Heuser submitted claims to the pension committee for additional benefits to offset the tax liability on the non-qualified portion of the distribution. For example, on July 16, 1990, William Rader submitted a claim in which he explained that he had conferred with a CPA and that he felt that the 5.25% adjustment was insufficient because it did not make him "whole." Based upon the calculations generated with his CPA, Rader sought an additional $110,471. On August 7, 1990, Shea sent Rader a letter indicating that his claim was denied because the full amount of benefits permissible under § 415 had already been paid from pension funds and the excess had been paid from corporate assets. In letters to other plaintiffs, Shea further explained that the 5.25% adjusted rate was not designed to "gross up" for tax liabilities, but to:

> "provide on an after tax basis a present value of the amount in excess of the Section 415 limit which would be substantially the same as the after tax present value of your distribution with the section 415 limit. A 5.25% after tax return should be a reasonable offset for an 8% pre-tax return. In addition the company has paid your FICA tax."

Each of these plaintiffs appealed the denial of their claims to the Employee Benefit Committee and their appeals were denied.

In their response to plaintiffs' motion for summary judgment, defendants concede

---

awards" based upon a percentage of the company's earnings were included within the salary history, Wickes testified that he could not have completed the process until sometime after the end of December, 1989. Wickes, Deposition at 203.

**6.** Plaintiff Ishmiel received this notification on April 21, 1990.

their third affirmative defense for exhaustion of administrative remedies, their seventh affirmative defense for the statute of limitations and their fifth affirmative defense are moot with the dismissal of plaintiffs' common law claims on the basis of my earlier ruling on preemption.

## DISCUSSION

The parties agree to all material facts regarding the plan and the 5+5 Amendment and hence, summary judgment is clearly appropriate to determine the legal effect of these agreed facts. Further, the parties indicate that they have submitted the same exhibits, depositions and affidavits that they would have submitted had this case been tried to the court. Thus, my opinion today constitutes both a ruling on summary judgment and, in effect, findings and conclusions.

In my overall review of the claims in this case and the nature of the relief sought, it became clear to me that, before I could begin to apply ERISA's provisions to the facts in this case, I first had to start with an understanding of the ERISA's overall structural framework including: (1) private rights of action under ERISA; (2) rights, duties and obligations under ERISA which may give rise to an identified cause of action; and (3) ERISA's remedial provisions—and determine how these three statutory components are to function together.

### a. A Brief Analysis of ERISA's Framework

ERISA was enacted in 1974 with the aim of protecting workers who earn pension benefits with a comprehensive statutory scheme. The Act sets standards for participation, vesting and funding and establishes an insurance system to protect pension plans. In addition, the Act enumerates fiduciary responsibilities with respect to plan disclosure and administration and provides both civil and criminal remedies to enforce these provisions. Administration of ERISA is shared by the Secretary of Labor and the Internal Revenue Service. *See* Generally, Martin Wald and David E. Kenty, *Erisa: A Comprehensive Guide*, § 1.1–1.4 (Wiley Law Pub.

1991); and Ronald J. Cooke, *ERISA Practice & Procedure*, (McGraw–Hill, Inc.1992).

The duties of a plan fiduciary are enumerated in Title 29 U.S.C. § 1104. Subsection (a) of 1104 requires that plan fiduciaries discharge their duties "solely in the interests of the participants and beneficiaries," and that they do so in a "prudent" manner. The section defines a "prudent man standard" as follows:

"the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

This section further provides that a fiduciary must diversify investments in the plan to minimize the risk of loss and should defray all reasonable expenses in administering the plan. These general obligations are supplemented by specific proscriptions in § 1106 which list certain "prohibited transactions" such as the sale of property between the plan and a party in interest or the fiduciary.

An additional fiduciary duty imposed upon the plan administrator includes the duty to disclose to all plan participants and beneficiaries summary plan descriptions, plan descriptions, and annual reports. 29 U.S.C. §§ 1021–1024. In addition, upon request of a participant or beneficiary, the administrator must supply a statement of total benefits accrued. § 1025. The summary plan description must apprise participants of their rights and obligations under the plan in a clear and concise manner. 29 C.F.R. 2520.-102–2 (1987).

While ERISA contains no provision requiring notice of factors not listed in 29 U.S.C. § 1021(a)(1) and 1022, *Stahl v. Tony's Building Materials*, 875 F.2d 1404, 1409 (9th Cir. 1989), the general duties imposed upon fiduciaries may require disclosure of relevant information over and above that specified. *Id.* However, this duty will not *generally* include individualized notice of potential impacts of administrative decisions. *See e.g. id.*, at 1409–1410 (no breach where fund failed to notify beneficiary that benefits could be drastically reduced upon expiration of bargaining agreement).

In contrast to the affirmative duties imposed on a fiduciary under § 1104, section 1109 provides for *liability* for *any* breach of a fiduciary duty. Section 1109 provides in pertinent part as follows:

"(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities or duties imposed upon fiduciaries under this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from the breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable relief as the court may deem appropriate, including removal of such fiduciary." (emphasis added).

The primary remedial provisions of ERISA are contained in § 1132 and outline the causes of action which may be maintained by plan participants and actions subject to enforcement by the Department of Labor. Section 1132(a) is broken down into three parts—(1) a claim for benefits under 1132(a)(1); (2) a claim for breach of fiduciary duty under 1132(a)(2); and (3) a "catchall" provision for injunctive or "other appropriate equitable relief" under 1132(a)(3) to redress a violation of "any provision of the subchapter or the plan." Although the text of this statute appears to fall neatly into three separate categories, cases construing these provisions show that, in most contested instances, claims brought under 1132(a)(1) *or* 1132(a)(2), have also tacked on requests for "other appropriate equitable relief" under 1132(a)(3).

 The first category, a claim for benefits under section 1132(a)(1), permits plan beneficiaries and participants to compel recovery of specific benefits due under the terms of a plan. Most cases under this provision involve disputes over the proper beneficiary, whether eligibility requirements were met or whether the correct calculation of benefits due has been made. *See e.g. Stone v. Stone,* 632 F.2d 740 (9th Cir.1980), (ex-spouse suit to compel direct payment under community property law), *cert. denied,* 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004

(1981). The standard of review of an action challenging a benefit eligibility determination is *de novo,* unless the benefit plan gives the administrator discretionary authority to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 953–4, 103 L.Ed.2d 80 (1989). If a claimant challenges a fiduciary's discretionary decision, a more deferential standard similar to the arbitrary and capricious standard is appropriate. *See Id.;* and *Bogue v. Ampex Corp.,* 976 F.2d 1319, 1325 No. 91–15038, slip op. 13903, 13913–13917 (9th Cir. Dec. 2, 1992). If the fiduciary is acting under a conflict of interest, that is a factor which must be considered in determining if there was an abuse of discretion. *Id.* If successful, a claimant under this provision may recover, in addition to the benefits sought, prejudgment interest if the withholding was wrongful. *Short v. Central States, SE & SW,* 729 F.2d 567, 576 (8th Cir.1984). However, in such a suit for benefits, courts have held that claimants are *not* entitled to recover extra-contractual damages under either 1132(a)(1) or the general equitable relief provision in 1132(a)(3). *See Johnson v. Dist. 2 Marine Eng. Beneficial Ass'n,* 857 F.2d 514, 518 (9th Cir.1988) (emotional distress and punitive damages for bad faith denial of medical benefits claim under 1132(a)(1) also unavailable under 1132(a)(3)).

The second category under § 1132(a)(2) provides that a participant or the Secretary may pursue an action to obtain "appropriate relief under § 1109." Recovery "to the plan" under sections 1132(a)(2) and 1109, or under the catchall provision of 1132(a)(3), has been strictly construed. In *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), a beneficiary sought compensatory, emotional distress and punitive damages under 1109(a) and 1132(a)(2) against the fiduciary personally for the alleged mishandling of her disability claim. Examining the text and legislative history of § 1109, the Court found that statute's emphasis on the relationship between the fiduciary and the plan as an entity led to the conclusion that "Congress did not intend that section [1109] to authorize any relief

except for the plan itself." *Id.*, at 144, 105 S.Ct. at 3091.[7]

The third category, section 1132(a)(3), has been called the "catch-all" because it provides as follows:

"(3) [A civil action may be brought] by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to **obtain other appropriate equitable relief** (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." (emphasis added).

Although, as noted above, 1132(a)(3) is often a "tack-on" for other remedies sought under 1132(a)(1) or 1132(a)(2), it may also stand alone. Commentators have noted that 1132(a)(3) is the appropriate "vehicle" to enforce ERISA's anti-discrimination provision, 29 U.S.C. § 1140, which prohibits an employer from discharging an employee for the purpose of interfering with the employee's attainment of any employment benefits. *See* Wald & Kenty, *ERISA*, § 7.28. Several courts have recognized a right to reinstatement and back pay to remedy a violation of § 1140. *See e.g. Folz v. Marriott Corp.*, 594 F.Supp. 1007 (W.D.Mo.1984).

While the remedial language in 1132(a)(3) is somewhat broader than that contained in 1109(a) as enforced through 1132(a)(2), the Ninth Circuit has applied the reasoning of the Supreme Court's decision in *Russell* to refuse to allow "extracontractual" emotional distress damages and lost interest to form the basis of a claim for breach of fiduciary duties under 1109 as enforced through 1132(a)(3). *Sokol v. Bernstein*, 803 F.2d 532, 538 (9th Cir.1986). In *Sokol*, the beneficiary of a pension plan brought an action against the plan administrator who had disbursed her benefits without her consent and thereafter refused to re-deposit the funds. The district court found that the administrator violated an express term of the plan requiring that disbursements be effectuated upon a beneficiary's request and awarded plaintiff lost interest from the administrator's refusal to redeposit funds, emotional distress damages and attorney's fees. The court reversed the award, reasoning that under *Russell*, ERISA remedies must focus on "the protection of the integrity of the plan" rather than recovery to an individual beneficiary. *Id.*, at 536. The Ninth Circuit found that, although *Russell* specifically addressed recovery under § 1109, the legislative history indicated that the same reasoning should apply with equal force to § 1132(a)(1), (2) & (3). *Id.*, at 536. In addition, the court found that when Congress used the phrase "other appropriate relief," it contemplated only injunctive or declaratory relief, such as removal of the fiduciary or imposition of a constructive trust. *Id.*, at 537–8.[8]

One slight extension of the *Russell* "to the plan" recovery limitation principle under a breach of fiduciary duty claim under § 1109 was recognized in *Amalgamated Clothing & Textile Workers v. Murdock*, 861 F.2d 1406 (9th Cir.1988). In *Murdock*, pension beneficiaries brought an action under § 1109(a) for a constructive trust on ill-gotten profits accruing to a fiduciary and damages against the fiduciary for causing a plan to purchase stock in two companies controlled by the fiduciary. Although the first part of the court's opinion relates to the issue of whether the claimants had "standing" as "participants" to bring the action because plaintiffs had already received their pension distribution, the court also discussed the types of remedies available under this subsection, noting that the "key" to ERISA enforcement is to "(ensure) that the fiduciary is not allowed to keep any ill-gotten profits." *Id.*, at 1412.

---

7. The Court specifically declined to address whether extra-contractual or punitive damages could be recovered by a *plan*. *Id.*, at 144, n. 12, 105 S.Ct. at 3091, n. 12.

8. Plaintiffs correctly note that, rather than reversing the entire award, the Court of Appeals remanded the action to the district court "for a determination of the amount of emotional distress damages which were awarded Sokol." *Id.*, at 538. However, earlier in the opinion, the court noted that the district court had awarded plaintiff $1,996.29 for loss of interest stemming from the fiduciaries' failure to redeposit funds and $4,000 in medical expenses and damages for emotional distress. *Id.*, at 534. Thus, the court did not explicitly address the interest award and it is unclear whether interest should be included in its analysis of impermissible "extracontractual" damages under 1132(a)(3).

One problem with the usual constructive trust remedy in *Murdock* was that the terms of the plan provided that any profits recouped by the plan were to be distributed back to one of the companies controlled by the fiduciary. To avoid this circular recovery and return of the ill-gotten profits to the fiduciary, the court held that the beneficiaries could recover the profits directly for the beneficiaries acting on "behalf of the entire plan" either under 1109(a) *or* the catchall provision in 1132(a)(3). *Id.,* at 1417.

### b. *Was there a Breach of a Fiduciary Duty?*

■ Plaintiffs specifically deny that their ERISA claim is premised upon a violation of § 1109, which, plaintiffs admit, would limit their recovery to a recovery for the benefit of the plan alone under the Ninth Circuit's reasoning in *Sokol* and *Johnson.* Further, there is no dispute that defendants fulfilled ERISA's specific disclosure requirements— the plan, the plan update and all annual reports were provided to plaintiffs. Instead, plaintiffs contend that defendants violated the general duty of care under § 1104 by failing to disclose all relevant tax information and that this duty arose because defendants *assumed* the duty to provide tax information by supplying *incomplete* and misleading information about tax consequences and by providing some generalized tax advice. Thus, the issue before me is whether defendants failed to fulfill the "prudent man" standard and failed to discharge their duties in the interests of plan participants as set forth in § 1104 when they decided not to alert employees eligible to participate in the 5+5 program of potential § 415 excess benefit tax liability.

In support of their claim that defendants "assumed" the duty to provide relevant tax impact information, plaintiffs first point to the February 1987 booklet entitled "Tax Reform and Your Benefits: An Overview," published by the U.S. West corporate benefits staff. This booklet advised all participants of the 1986 Amendments to the tax code including a potential penalty tax on all retirement plan payments that exceeded certain limits. Chapter 4 of the overview advised partici-

pants that maximum annual payments that can be made in a given year to retired employees was modified with the 1987 tax code amendments and that the committee would notify employees affected by those modifications "as additional IRS guidelines are available." The booklet also advised participants to consult with a personal tax or financial advisor when making any decisions about benefits.

The January 1989 Summary Plan Description provides no substantive guidance on tax liability from distributions. However, Section G explains that all payments from the trust are within ERISA qualified limits but notes that the companies "currently provide their employees with the pension benefits they have earned without regard to ERISA maximums," and that any excess will be paid out of general operating expenses directly to the individual. Plaintiffs do not allege that any of the above mentioned plan documents contained any misleading information. They rely upon these documents solely to establish that defendants assumed a "duty" to provide the § 415 limit tax information.

Plaintiffs argue that the affirmative representations which appear in the 5+5 plan under the "Tax Considerations" section establish that the defendants undertook the duty of providing tax advice and that the 5+5 Plan representations were incomplete, thus constituting a material omission which resulted in a breach of their fiduciary duties causing individual harm to them *following* distribution of the lump sum. Plaintiffs seek to "set aside" the transactions and obtain reinstatement with back pay, or alternatively, front pay to the date they would have retired had they not exercised the 5+5 option, or as a further alternative, a "surcharge" equal to the amount of lost tax deferred earnings on the portion of the lump sum payment which was ineligible for a rollover into an IRA.

■ Defendants argue that once the specific disclosure provisions of ERISA are complied with, any breach of fiduciary duty claim based on such non-disclosure must fail. I reject such a sweeping conclusion since I can envision circumstances in which material omissions may in fact make "accurate" factual disclosures misleading. However, I do not

feel that this case presents such a circumstance given the nature of the disclosures and defendants' repeated advice to eligible employees to seek independent professional advice.

Pension Committee defendants do not dispute that, although they were generally aware of § 415 limits and their potential limitations on some employees, there was "no general communication or information anticipating a § 415 problem" in plan documents or the 5+5 materials distributed to employees. Kamen Deposition, at 36; Masztaler Deposition at 46. Kamen confirmed that a deliberate decision was made to leave the information out to avoid "confusing" the issues since they assumed the potential impact would only affect approximately 1% of those offered. *Id.* Kamen and Bouchard both testified that they felt that any potential tax consequences to individual participants in the 5+5 program would be discovered and considered when employees conferred with their individual tax consultants.[9] Joan Masztaler, a member of the pension committee, testified in her deposition that her only prior exposure to § 415 limits was with a few highly compensated, high level executives—she was aware that they were paid such excess benefits from operating assets and knew that § 415 limits applied to a limited group of people and involved a "very individual calculation."

Plaintiffs counter defendants' claimed good faith reasons for not including § 415 limit information in any of the 5+5 promotional materials by pointing out that there was a report from Towers and Perrin dated November 9, 1989 listing "estimated corporate cash outlay" for benefits exceeding 415 limitations. The report shows an estimated cost to the company of $26,221,243 and estimates that 690 employees out of 6315 eligible would receive amounts exceeding § 415 limits.

First, there is no indication of who prepared this chart—Gene Wickes testified that he was unaware of its existence, as did the other members of the pension staff. Second, the report reflects only general estimated numbers and no individual employees are identified. What the report does show however, is that the majority of those raw numbers who were expected to receive excess amounts fall primarily in the 43–50 year old age range. The report indicates that *no* employees in the 55–64 age group would receive excess benefits, and that only 37 employees in the 51–54 age group might be affected. Thus, even if Wickes and the pension committee *had* been aware of this report, it was consistent with their view that the impact would have primarily fallen on younger members of the eligible pool who were generally *not* expected to find early retirement an attractive option.

█ Based upon my review of all of the evidence and deposition testimony, I find that the Pension Committee's decision *not* to address § 415 limitations in the 5+5 plan materials was not a breach of its fiduciary duties. I find that its decision was the product of an estimate that was simply not borne out—that is the numbers of affected individuals would be small and that the amount of benefits which would be non-qualified would be insignificant. I find that its actions fall well within the "prudent man" standard and the general duty to act in the interests of plan participants as outlined in § 1104. At most, with the benefit of hindsight, this was a tactical error in judgment which is mitigated by the caution to seek independent financial and tax advice. The fact that plaintiffs sought such advice and that no one caught the impact only confirms that this was not the kind of obvious, reckless oversight which might give rise to fiduciary liability.[10] Fur-

---

**9.** In fact, most of the plaintiffs in this case did consult with tax and financial advisors prior to making their election and have indicated that no one caught the potential § 415 limitation problem. Plaintiffs' accounting expert, Patricia Buescher, and actuarial expert Rolf Trautmann, indicate in their declarations that CPAs and financial advisors do not make defined benefit plan § 415 calculations and thus, could not have been expected to "catch" the § 415 limitation on the non-qualified portion of the lump sum distribution.

**10.** I note that some courts have imposed an even higher standard of proof for a breach of fiduciary duty under § 1104 of ERISA, requiring evidence of "willful" or "bad faith" conduct. *See e.g. Burke v. Latrobe Steel Co.,* 775 F.2d 88, 91 (3rd Cir.1985); and *Bernatowicz v. Colgate Palmolive,* 785 F.Supp. 488, 494 (D.N.J.1992) (dismissing

ther, I find that plaintiffs were not entitled to individualized *notice of the amount of their* estimated non-qualified distribution prior to the expiration date for the election. Plaintiffs were entitled to have defendants address program highlights on a macro, rather than a micro, level, leaving individualized analysis to the employees especially given the size of the pool and the amount of time and effort needed to gather the relevant information together and analyze the impacts.

■ In addition, I find that the Committee's decision to mitigate the impacts of the § 415 limitations on plaintiffs and other similarly situated employees by reducing the discount rate from 8% to 5.25% was reasonable under the circumstances and was an action that was clearly taken in the interests of plan participants and to the detriment of the employer since the increased excess benefit payments would be provided from corporate assets. Although the adjustment did not "gross-up" plaintiffs' lump sum benefits as they had hoped, it did result in an increase which compensated for the losses on the future income stream. I realize that defendants' expert actuary, Douglas Holden and plaintiffs' expert actuary, Rolf Trautmann, disagree on the best way to compensate for the tax liabilities on non-qualified portions. Although Trautmann's proposed compensation scheme may present a viable alternative approach,[11] I agree with Mr. Holden's conclusion and find that the Committee's adoption of Wickes' recommendation was reasonable under the circumstances and proper under both the *de novo* review I have given this decision, as well as the arbitrary and capricious standard of review usually applied to discretionary fiduciary decisions.[12]

c. *Even if there was a Breach, is there a remedy?*

■ First, because plaintiffs have been paid all benefits promised under the 5+5 plan formula, they cannot, as they concede, maintain a claim for benefits due under the plan pursuant to 1132(a)(1). Second, plaintiffs emphasize that they are not seeking benefits under 1132(a)(2), via a claim for breach of a fiduciary duty under § 1109, recognizing that § 1109 relief is limited to actions to recover benefits "to the plan" and there is no dispute that plaintiffs' claims for reinstatement or monetary damages are individual and are not sought for the benefit of the plan as a whole. Third, plaintiffs do not seek statutory remedies for defendants' failure to provide information, conceding that the tax information sought was not specifically compelled by ERISA nor the Internal Revenue Code. Thus, plaintiffs' claims for relief for an alleged breach of a fiduciary duty *solely* upon 1132(a)(3)(B)(ii) which permits a participant to "obtain other appropriate equitable relief . . . to enforce any provision of this subchapter."

■ As to their claim under 1104 and the catchall clause in 1132(a)(3), plaintiffs have failed to identify any "other" statutory provision of ERISA that defendants allegedly violated, other than the general fiduciary duty provision located in § 1104, which, as I have already noted, may give rise to relief under §§ 1109 and 1132(a)(2) *if* they sought to recover benefits for the plan. Based upon my reading of the statute, I find that § 1104 and § 1109 are *complementary* provisions rather than alternative bases for liability. *See Flacche v. Sun Life Assur. Co. of Canada,* 958 F.2d 730, 733 (6th Cir.1992) (noting relationship of §§ 1104 to 1109 and 1132(a)(3)(B)). That is, because § 1104 only outlines the duty, I must look also to § 1109

claim of negligent failure to fully inform employees about particulars of early retirement program). Because I find that plaintiffs have failed to demonstrate a breach under the more flexible "prudent man" standard, I need not reach this issue.

**11.** However, I note that Trautmann's proposed damage analysis *assumes* that each plaintiff would in fact have rolled the entire non-qualified portion of the distribution into an IRA. Thus,

had I found a breach of fiduciary duty, factual issues would have remained regarding the amount of damages recoverable to each plaintiff.

**12.** Because I find that there was no breach of a fiduciary duty under an assumption that *all* defendants were aware of the TP & C report, I need not reach the issue of whether the employer, U.S. West, was also a plan "fiduciary" as to these claims.

which provides liability for the breach of that duty. Thus, because relief under § 1109 is addressed in § 1132(a)(2) and is limited to recovery "to the plan" as a whole, plaintiffs may not seek individual relief by circumventing § 1109 and § 1132(a)(2) with a claim under § 1104 and § 1132(a)(3).

I recognize that courts have held that I retain some discretion to "fashion" appropriate equitable relief in certain circumstances. *See e.g. Beck v. Levering,* 947 F.2d 639, 641 (2nd Cir.1991) (section 1109 permits fashioning of relief under common law trust principles); *compare Russell,* 473 U.S. at 148, 105 S.Ct. at 3093 (noting that when statute provides particular remedies courts must be "chary" of reading other remedies into it) (citations omitted). I also recognize that "equitable" relief may include a monetary award which goes directly to claimants under a constructive trust theory. *See e.g., Murdock,* 861 F.2d at 1413 (discussed, *supra*). However, even if I determined that defendants breached a fiduciary duty owed to plaintiffs by reason of § 1104, (also setting aside the cause of action created by § 1109 and its limitations), there are several reasons why I find that plaintiffs simply could not recover the type of relief they seek under the circumstances in this case.

First, although defendants argue that employees may *never* recover compensatory damages for a breach of a fiduciary duty under § 1132(a)(3), plaintiffs correctly point out that the only remedies the Ninth Circuit has precluded as "extracontractual damages" under § 1132(a)(3) are emotional distress and punitive damages. *Citing Johnson,* 857 F.2d at 518; and *Sokol,* 803 F.2d at 538. I note a split of authority regarding the availability of *other* forms of extracontractual damages similar to the tax benefit losses claimed in this case. *See Novak v. Andersen Corp.,* 962 F.2d 757, 761 (8th Cir.1992) (beneficiary may not recover monetary damages for tax benefit losses under § 1132(a)(3) for alleged violation of IRC provision requiring notice of 60 day rollover limit); *Kemp v. Control Data Corp.,* 785 F.Supp. 74, 76 (D.Md.1991) (section 1132(a)(3) is merely an enforcement

mechanism and creates no broader relief for breach of fiduciary duties than does § 1109); *Samos v. Dean Witter Reynolds,* 772 F.Supp. 715, 718 (D.R.I.1991) (section 1132(a)(3) does not allow for any compensatory damages for breach of a fiduciary duty); and *Allison v. Dugan,* 737 F.Supp. 1043, 1049 (N.D.Ind. 1990) (same); *Cf. Warren v. Society Nat. Bank,* 905 F.2d 975, 982 (6th Cir.1990) (pension claimant may recover monetary damages under § 1132(a)(3) for investment earnings loss due to tax liability for non-qualified distribution where manner of distribution violated terms of plan), *cert. denied,* —— U.S. ——, 111 S.Ct. 2256, 114 L.Ed.2d 709 (1991).

Although the Ninth Circuit has not directly addressed the issue of whether beneficiaries may *personally* recover tax benefit losses under § 1132(a)(3) if they establish a breach of fiduciary duty and causation, in applying the Supreme Court's decision in *Russell* to the facts in *Sokol,* the court emphasized that the limitations on *who* may recover under § 1132(a)(2) were *equally* applicable to the catchall provision in § 1132(a)(3) in light of the legislative history:

> "The legislative history of ERISA supports the proposition that the entire statute was aimed at the protection of the integrity of pension plans, rather than at protection of beneficiaries."

Thus, plaintiffs' emphasis upon the fact that the *type* of damages sought in this case differ from the *type* of damages precluded in *Russell* and *Sokol* is somewhat misplaced since the decision in *Russell* was based entirely upon *who* was seeking the relief rather than the nature of the relief sought and *Sokol* was based *both* upon who was seeking the relief as well as the type of relief sought.

 The court's analysis in *Sokol* leads me to conclude that, if so confronted, the court would follow the analysis of the Eighth Circuit in *Novak,* and find that lost tax benefits are "extra-contractual" and thus, do not fall within the "other appropriate equitable relief" available under § 1132(a)(3)(B). *See Novak,* 962 F.2d at 760.[13] I find that my conclusion is consistent with general trust principles and the remedial structure of

---

13. However, because plaintiffs' claims relate to the administration of the plan and plan amend-

ment, they are preempted by ERISA. *See* Opinion of July 30, 1992, at pp. 3, 8.

ERISA—the alleged ill-gotten gains from defendants' breach have not gone to the employer or any of the fiduciaries, but rather the direct losses suffered by plaintiffs have gone to the IRS. To the extent that plaintiffs attempt to extend this theory one step further by arguing the U.S. West benefitted from the fact that they no longer had to pay salaries to plaintiffs, I find that plaintiffs have failed in their offer of proof on this point and that any such "savings" to U.S. West, over and above the substantial lump sum payments and in light of anticipated staff cut-backs, is purely speculative.

Finally, although a reinstatement remedy is clearly available for an action under § 510 for discrimination if an employee demonstrates that a termination was motivated by a desire to prevent recovery of benefits, I am unaware of any authority, statutory or otherwise, which would permit me to provide reinstatement as a remedy for a violation of a breach under § 1104 via §§ 1109 and 1132. Further, I am convinced by defendants' proffer that reinstatement is no longer a viable option since plaintiffs retired almost three years ago and the organization has undergone significant structural changes since that time.

## CONCLUSION

Based on the foregoing, I find that plaintiffs have failed to demonstrate that defendants breached fiduciary duties and that the pension committee's decision to adjust the discount rate for the non-qualified portions of the distribution was reasonable and neither arbitrary nor capricious. In addition, to the extent that plaintiffs claim that their expectations of the 5+5 election have not been fulfilled, I find that the remedies they seek are simply unavailable under ERISA's remedial scheme since plaintiffs have received all benefits due to them by way of their election under the 5+5 plan. Accordingly, plaintiffs' motion for summary judgment on its first claim (# 56) for relief is denied, plaintiffs' motion for summary judgment against certain affirmative defenses (# 57) is moot and defendants' motion for summary judgment against plaintiffs' first claim (# 48) is granted. Because I previously held that plaintiffs'

remaining state law claims are preempted by ERISA, all claims are now hereby dismissed and this action is closed.